[819 NE2d 197, 785 NYS2d 729]

In the Matter of RICHARD A. GROSS et al., Respondents, v ALBANY COUNTY BOARD OF ELECTIONS, Respondent, and WILLIAM M. HOBLOCK et al., Appellants. (And Another Related Proceeding.)

Argued September 8, 2004; decided October 14, 2004

**POINTS OF COUNSEL**

*DerOhannesian & DerOhannesian,* Albany (*Paul DerOhanne-sian II* of counsel), for appellants. I. Invalidating qualified voters' absentee ballots abrogates the right to vote. (*Yick Wo v Hopkins,* 118 US 356; *Reynolds v Sims,* 377 US 533; *Griffin v Burns,* 570 F2d 1065; *United States v Classic,* 313 US 299; *United States v Mosley,* 238 US 383; *Shannon v Jacobowitz,* 301 F Supp 2d 249; *Bush v Gore,* 531 US 98; *Matter of Hopper v Britt,* 203 NY 144; *Matter of Powers v Donahue,* 276 AD2d 157; *Matter of Staber v Fidler,* 65 NY2d 529.) II. Objections to the validity of an absentee application must be made before issuance of the absentee ballot to the voter. (*Sheils v Flynn,* 164 Misc 302, 252 App Div 238, 275 NY 446; *Matter of Mondello v Nassau County Bd. of Elections,* 6 AD3d 18; *Griffin v Burns,* 570 F2d 1065.) III. The Albany County Board of Elections acted ministerially when it issued the contested absentee ballots. (*Matter of Wicksel v Cohen,* 262 NY 446; *Matter of Graziano v County of Albany,* 309 AD2d 1062, 1 NY3d 507.) IV. Contested absentee ballots should be counted because of voters' unavoidable absence from the county on election day.

*A. Joshua Ehrlich,* Albany, for Richard A. Gross and another, respondents. I. The State Constitution and the Election Law require actual absence for an absentee ballot to be validly cast and canvassed. (*Sheils v Flynn,* 164 Misc 302, 252 App Div 238, 275 NY 446; *Matter of Cristiano v Otsego County Bd. of Elections,* 181 AD2d 941; *Matter of Sherwood v Albany County Bd. of Elections,* 265 AD2d 667; *Matter of Staber v Fidler,* 65 NY2d 529.) II. The affidavit on the ballot, as well as the application, controls whether the vote should be cast and canvassed. (*Matter of Cristiano v Otsego County Bd. of Elections,* 181 AD2d 941; *Matter of Sherwood v Albany County Bd. of Elections,* 265 AD2d 667.) III. The decisions of the Appellate Division departments

have led to a fundamental change in the conduct of elections in this state. (*Marks v Stinson,* 19 F3d 873; *Scheer v City of Miami,* 15 F Supp 2d 1338; *Matter of Staber v Fidler,* 65 NY2d 529.) IV. Both answers admitted that the 2004 absentee ballots should not count. V. The opponents' arguments are contradictory. Strict construction should be applied uniformly to all absentee ballots in this case.

### OPINION OF THE COURT

Per Curiam.

This appeal concerns the validity of certain absentee ballots cast during a special general election for two seats on the Albany County Legislature.

In April 2003, the Albany County Legislature's redistricting plan was challenged in federal court. As a consequence of the litigation, the Albany County Board of Elections was enjoined from conducting the primary and general elections for particular districts of the Albany County Legislature that had been scheduled for fall 2003. A revised redistricting plan was accepted by the federal court in October 2003, but the resolution came too late to permit election officials to implement the new plan for the November elections. The United States Court of Appeals for the Second Circuit therefore determined that a special primary election would be conducted on March 2, 2004 (to coincide with the national primary elections), and ordered a special general election to be held "expeditiously thereafter" on terms established by the District Court on remittal (*Arbor Hill Concerned Citizens v County of Albany,* 357 F3d 260, 263 [2d Cir 2004]).

Consistent with the Second Circuit decision, the District Court issued a written order on February 2, 2004 dictating the manner in which the special primary and special general elections would be conducted. Pertinent to the issue on this appeal, the court directed that registered voters who had filed applications requesting absentee ballots for the fall 2003 elections would be sent absentee ballots for the special primary election scheduled for March 2, 2004 without having to file new applications. This accommodation was apparently made because there was insufficient time in the four-week period between the District Court order and the special primary to notify the public of the election, solicit and process absentee voter applications, and forward ballots to the affected voters as the New York Election Law ordinarily requires. With respect to the special general

election—scheduled for April 27, 2004—the court ordered that "[t]he process for obtaining and counting absentee ballots . . . shall be governed by Article 8 of the New York Election Law." Under article 8, in order to become qualified to cast an absentee vote, the voter must file an application requesting an absentee ballot that particularizes why the voter is unable to vote at the polls on election day.[1]

The Albany County Board of Elections followed the District Court directives on absentee balloting with respect to the special primary election but failed to do so with respect to the special general election, instead forwarding an absentee ballot to any voter who had requested one during the fall 2003 elections. As a result, a number of voters who cast absentee ballots during the special general election did not file applications establishing that they were eligible to do so as the Election Law and the federal court order required.

At issue in this case are races in two Albany County legislative districts—the 26th and 29th districts. After the machine counts revealed that the electoral results were close, the affected candidates and their counsel met at the Albany County Board of Elections on May 5, 2004 to canvass the absentee, military and special ballots filed in those districts. In addition to other objections not relevant to this appeal, the candidates asserted that certain absentee ballots were invalid due to the Board's noncompliance with the federal court order and article 8 of the Election Law.

Having timely lodged their objections before the Board, the candidates filed cross petitions in Supreme Court under Election Law § 16-106 raising the question whether the absentee ballots collected in violation of the court order and the Election Law could be counted. At the hearing, the testimony indicated that the Board's failure to require absentee ballot applications arose from a misinterpretation of the federal court order, with no allegation of fraud or other intentional misconduct. Supreme

---

**1.** Federal courts have held that they have the equitable power under the Voting Rights Act of 1965 (42 USC § 1973) to order special elections to remedy apportionment violations and, in doing so, that they may dictate the procedures under which those elections are to be conducted (*see Arbor Hill Concerned Citizens v County of Albany*, 357 F3d at 262-263). The impact of the District Court's decision to order the Board to forward absentee ballots to voters in the special primary election without the specific application required under Election Law § 8-400 is not before us in this Election Law § 16-106 proceeding which challenges only the ballots cast in the special general election.

Court held that the noncompliant absentee ballots should not be canvassed. A majority of the Appellate Division affirmed but two Justices dissented prompting an appeal as of right to this Court. We agree with the determination of the courts below that the absentee ballots collected in violation of both a federal court order and article 8 of the Election Law are invalid and we therefore affirm the order of the Appellate Division.

Article II, § 2 of the New York Constitution, adopted in 1919, states that "[t]he legislature may, by general law, provide a manner in which, and the time and place at which, qualified voters who, on the occurrence of any election, may be absent from the county of their residence or . . . may be unable to appear personally at the polling place because of illness or physical disability, may vote and for the return and canvass of their votes."[2] Thus, in New York, the right to vote by absentee ballot is purely a statutory right (see NY Const, art II, § 2; Election Law § 8-400).

The Legislature passed absentee voting legislation in 1920 (see L 1920, ch 875). New York was among the many states that "built in elaborate provisions to safeguard voter privacy and the integrity of the ballot" (J. Fortier and N. Ornstein, *The Absentee Ballot and The Secret Ballot: Challenges for Election Reform*, 36 U Mich JL Reform 483, 492-493 [2003]). The safeguards were adopted in recognition of the fact that absentee ballots are cast without the secrecy and other protections afforded at the polling place, giving rise to greater opportunities for fraud, coercion and other types of mischief on the part of unscrupulous partisans (*id.* at 492-493, 512-513).

Consistent with the limited circumstances contemplated in the Constitution, Election Law § 8-400 (1) provides that a voter may be qualified to cast an absentee ballot if he or she will be "unavoidably absent from the county of . . . residence" on election day, is "unable to appear personally at the polling place . . . because of illness or physical disability," including due to treatment at a hospital, or is detained in jail awaiting trial or in prison after conviction for a nonfelony offense.

---

2. It appears that the decision to allow absentee voting was not without controversy. A New York Times article urged that the constitutional amendment authorizing the Legislature to enact an absentee voting scheme "ought to be beaten at the polls," characterizing absentee voting as "a doubtful and even dangerous remedy" where "[t]he danger of fraud is palpable" (*Four Amendments*, New York Times, Oct. 15, 1919, at 16).

Like its predecessors, the current New York Election Law prescribes a detailed scheme for the issuance, collection and canvassing of absentee ballots. Prior to casting an absentee vote, the Election Law requires that the voter apply for an absentee ballot. Among other information, the written application must contain "[a] statement, as appropriate, that on the day of such election the applicant expects in good faith to be in one of the . . . categories" qualified to vote by absentee ballot (Election Law § 8-400 [3] [c]). The prospective voter must sign the application, certifying that the information in it is true and correct, and affirm an understanding "THAT THIS APPLICATION WILL BE ACCEPTED FOR ALL PURPOSES AS THE EQUIVALENT OF AN AFFIDAVIT AND, IF IT CONTAINS A MATERIAL FALSE STATEMENT, SHALL SUBJECT ME TO THE SAME PENALTIES AS IF I HAD BEEN DULY SWORN" (Election Law § 8-400 [5]). Significantly, the Election Law does not allow automatic renewal of absentee ballot applications unless a voter is determined to be "permanently disabled" or is a "hospitalized veteran" (see Election Law § 8-400 [4]; § 8-404); only then are election officials permitted to send absentee ballots without a specific request.

Upon receipt of an absentee ballot application, the local board of elections determines "upon such inquiry as it deems proper whether the applicant is qualified to vote and to receive an absentee ballot," which may include conducting an investigation into the accuracy of the information provided (Election Law § 8-402 [1], [2]). If the board finds the application acceptable, the absentee ballot will be forwarded to the voter (Election Law § 8-402).

The form of the absentee ballot is dictated by Election Law § 7-122. Under the statute, the ballot is enclosed in an envelope bearing an affirmation that must be signed by the voter, as follows:

> "I do declare that I am a citizen of the United States, that I am duly registered in the election district shown on the reverse side of this envelope and I am qualified to vote in such district; that I will be unable to appear personally on the day of the election for which this ballot is voted at the polling place of the election district in which I am a qualified voter because of the reason given on my application heretofore submitted . . .
>
> "I hereby declare that the foregoing is a true state-

ment to the best of my knowledge and belief, and I understand that if I make any material false statement in the foregoing statement of absentee voter, I shall be guilty of a misdemeanor" (Election Law § 7-122 [8]).

Thus, at the time the completed ballot is forwarded to the board, the voter reaffirms that he or she continues to be unable to vote in person at the polls on the day of the election for the reason previously attested to in the application.

Once the ballot is returned to the board, it is subject to challenge by an inspector, watcher or any registered voter "upon the ground . . . that the voter was not entitled to cast an absentee . . . ballot," among other grounds (see Election Law § 8-506 [1]). Following the election, the board meets "no more than ten days after a general election and no more than eight days after a special or primary election" to canvass absentee, military and other special ballots (Election Law § 9-209 [1] [a]; L 2003, ch 256, § 4 [for general elections, effective December 31, 2004, the time period was reduced from 13 days to 10]). The involved candidates, political parties and independent bodies may appoint watchers to attend the canvass who may object to the casting or canvassing of any ballot or the refusal to cast or canvass any ballot. Board inspectors are authorized to canvass a ballot if they find that "ministerial error" on the part of the board or its employees "caused such ballot envelope not to be valid on its face" (Election Law § 9-209 [2] [a] [2]). If no objection is lodged to the board's decision to canvass or refuse to canvass a particular ballot during the canvass, that ballot cannot later be the subject of a judicial challenge (see Sheils v Flynn, 275 NY 446, 452 [1937]).

In the event of a timely objection, however, the board has three options: it may canvass the ballot, refuse to canvass the ballot, or, "[i]f the board cannot agree as to the validity of the ballot it shall set the ballot aside, unopened, for a period of three days at which time the ballot envelope shall be opened and the vote counted unless otherwise directed by an order of the court" (Election Law § 9-209 [2] [d]). Election Law § 16-106 (1) authorizes a summary judicial proceeding to resolve an objection, which proceeding was initiated by the candidates in this case to determine the validity of the absentee ballots. Like the board, in such a proceeding a court is empowered to overlook certain ministerial errors appearing on the face of the ballot envelope.

The primary objective of this comprehensive statutory scheme is to ensure fair elections by protecting the integrity of the ballot. We have previously recognized in the context of the Election Law that where, as here, the Legislature "erects a rigid framework of regulation, detailing . . . specific particulars," there is no invitation for the courts to exercise flexibility in statutory interpretation (*Matter of Higby v Mahoney*, 48 NY2d 15, 20 n 2 [1979]). Rather, when elective processes are at issue, "the role of the legislative branch must be recognized as paramount" (*id.* at 21). "Broad policy considerations weigh in favor of requiring strict compliance with the Election Law . . . [for] a too-liberal construction . . . has the potential for inviting mischief on the part of candidates, or their supporters or aides, or worse still, manipulations of the entire election process" (*Matter of Staber v Fidler*, 65 NY2d 529, 534 [1985]). Strict compliance also "reduces the likelihood of unequal enforcement" (*id.*). The sanctity of the election process can best be guaranteed through uniform application of the law.

That being said, however, there are instances where inconsequential deviations from the letter of the law will not be fatal. For example, in *Matter of Weinberger v Jackson* (19 NY2d 995 [1967], *affg on op below* 28 AD2d 559, 559 [2d Dept 1967]), this Court held that ballots invalidated because voters marked the parallelogram next to the candidate's name (the party emblem) instead of the voting square should have been counted, adopting the reasoning that "[t]he right of the voter to be safeguarded against disenfranchisement and to have his intent implemented wherever reasonably possible . . . transcends technical errors, particularly when induced" by a confusing ballot. There is no question that the "object of election laws is to secure the rights of duly qualified electors," not to frustrate them by posing technical obstructions that bear no relationship to the policies underlying the statutes (*People ex rel. Hirsh v Wood*, 148 NY 142, 147 [1895]).

Absentee voting serves the laudable purpose of opening the voting process to a larger electorate but there are dangers inherent in the system that warrant adherence to article 8's legislative prescriptions. Here, although we sympathize with the voters in this case who presumed they were submitting valid absentee ballots, the Board's error simply cannot be characterized as technical, ministerial or inconsequential because it was central to the substantive process by which voters are deter-

mined to be qualified to cast absentee ballots.[3] The Legislature's carefully crafted procedure for ensuring the validity of absentee votes was circumvented by the Board's decision to forward absentee ballots to voters who had not applied for them. These voters never articulated why they were not able to vote at the polls on April 27, 2004, the day of the special general election, as article 8 of the Election Law and the federal court order required.[4] The Board therefore had no basis to conclude that these voters were qualified to cast absentee votes. In addition, as a result of the Board's actions, the absentee ballot rules were not applied uniformly to all who voted in the special general election—some voters were required to comply with the application requirement while others (those who cast the ballots at issue) were excused from doing so.

Nor is this a case where a minor alteration of procedure can be viewed as substantial compliance with statutory directives. As a result of the failure to adhere to Election Law § 8-400, sev-

---

3. The dissent's reliance on the "ministerial error" provision in Election Law § 16-106 is misplaced. By its terms, the statute authorizes a court to overlook a "ministerial error" that "caused such *ballot envelope* not to be valid *on its face*" (Election Law § 16-106 [1] [emphasis added]), the same power possessed by the board (*see also* Election Law § 9-209 [2] [a] [2]). The absentee ballots in this case were not invalidated due to facial defects on the ballot envelopes. Moreover, as used in this context, the phrase "ministerial error" suggests a clerical or other inconsequential mistake comparable to the situation in *Matter of Carney v Niagara County Bd. of Elections* (8 AD3d 1085 [4th Dept 2004] [where the Board failed to date/time-stamp a military ballot envelope that was timely filed]). In contrast, here the ballots were invalidated due to a substantive deficiency implicating voter qualification. Furthermore, it appears that the dissent is using the concepts of "ministerial error" and "ministerial duty" interchangeably; only the latter is addressed in *Matter of Wicksel v Cohen* (262 NY 446 [1933]) and we believe there are meaningful distinctions. But even if "ministerial error" means what the dissent says it means, the error here was not ministerial because it involved the Board's exercise of judgment—the interpretation and implementation of a federal court order in the context of a special election—and affected the manner in which that body exercised its statutory obligation to determine absentee voter eligibility (*see* Election Law § 8-402). Although the Board performs many ministerial functions, this was not one of them.

4. We reject the appellants' suggestion that the voters' prior assertions made in their fall 2003 absentee ballot applications should be carried forward and applied to this election. Putting aside the fact that this is not what the statute or court order required, at the time the prior ballots were requested, it was unclear whether there would be a special general election, much less the date of that election. It would therefore have been impossible for these voters (who were not "permanently disabled" or "hospitalized veterans") to have made a good faith statement of their inability to vote at the polls on the day of the special general election.

eral other provisions of the Election Law were also disregarded, including the duty to assess the validity of applications before forwarding absentee ballots (*see* Election Law § 8-406) and the requirement that voters reaffirm under penalty of criminal prosecution that they are unable to vote at the polls on the day of the election for the reason indicated in the application (*see* Election Law § 7-122 [8]). Hence, despite the absence of fraud or intentional misconduct, the fact remains that the voters who cast the ballots at issue were not determined to be "duly qualified electors" under the absentee ballot scheme, which distinguishes this case from many of those cited by appellants and the dissent. For example, the dissent relies on *People ex rel. Hirsh v Wood* (148 NY 142 [1895]), a case decided long before absentee voting was authorized in New York and which involved a post-election challenge to the form of the ballot.[5] There, the clerk who drew up the ballot listed candidates on a minor party line even though they had not been nominated by that party. After the election, an opposing candidate sought to invalidate all the votes cast on that party line at the polls on election day. We declined to void the votes, noting that there was no question but that the votes had been cast by "duly qualified electors."

The dissent suggests that the challenged absentee ballots should be canvassed despite the Board's departure from the qualification process because the voters who cast the ballots were innocent of any wrongdoing. This is certainly true in the sense that the voters' reliance on the Board's mistake was understandable—but this same rationale could be applied virtually any time a board fails to comply with statutory directives governing voting. Reliance on board actions or directives will almost always be reasonable since few voters have sufficient familiarity with the Election Law to catch an error and most have little reason to question voting procedures. Thus, an exception predicated on voter innocence would swallow the rule, effectively relieving election officials of their obligation to adhere to the law. For these reasons, we agree with the Appellate Division majority that to overlook a substantive error of this magnitude would invite future impermissible deviation from statutory requirements that have been devised to ensure fair elections.

---

5. After *Hirsh* was decided, statutes were passed that provide for public inspection of ballots prior to the election so that errors can be detected and challenges to the form of the ballot resolved before votes are cast (*see* Election Law §§ 7-128, 16-104).

Accordingly, the order of the Appellate Division should be affirmed, without costs.

ROSENBLATT, J. (dissenting). The two most important interests of the Election Law are closely balanced in this case: on the one hand, the need for rigorous application of rules that govern elections; on the other, letting the voter's vote count. I appreciate the majority's dedication to enforcing rules designed to prevent irregularities. Experience has shown that too many elections have been touched, if not infused, by fraud, and that we need rules to keep the process honest. To be sure, some rules require the most stringent enforcement if the system is to function. Others, however, can and should tolerate some flexibility. This is particularly so when, as here, the strict application of the rule does not further the Election Law's objectives.

We have, at times, construed the Election Law's rules to disenfranchise voters. When we did, it was because we felt that on balance a more permissive interpretation would threaten the process or future elections. Thus, while I do not see the majority's opinion as grudging or as evincing a hidebound, technical character, the scales here tip in favor of the voter.

The voters did exactly as they were told—not by amateurs or partisan functionaries, but by the very governmental body whose job it is to interpret and apply the Election Law in all of its complexity. If the majority is correct, the voters, to have their votes counted, would have had to send their absentee ballots back to the Election Board and tell the Board that it misread both the Election Law and a federal court order. I can think of no voter endowed with the sophistication and audacity required to issue such a rebuke. This case is unusual, if not unique, in that the voters are being denied their vote for having followed the protocol established by the experts lawfully charged with running the election.

In this respect, the situation of the voters here should contrast with that of candidates who commit technical violations of the Election Law. In a significant number of cases, we have invalidated designating petitions when candidates failed to satisfy the requirements of the statute. When a candidate falls short of the mark and is expelled on technical grounds, it is no occasion for rejoicing. After all, the voters are being denied a choice. But candidates know, or should know, the perils of the Election Law. If they do not comply with its terms, we might say they bear the fault. We can take no such comfort here. These voters were

entirely innocent and had no reason to imagine that their votes were vulnerable.

The purpose of the Election Law's rules is to foster order and defeat fraud. If the Board of Elections were constituted by a single member, one might suspect that, for political gain, that partisan official could be tempted to ignore or misapply the federal court order. The Board, however, is bipartisan. There is not a hint of fraud here. More importantly, in a two-party contest, there is virtually no possibility of any fraud when Commissioners—who are political rivals—both agree in good faith as to how absentee balloting should be administered.

Finally, today's decision conflicts with both Election Law § 16-106 (1) and our venerable precedent, *People ex rel. Hirsh v Wood* (148 NY 142 [1895]).

### I.

To deter fraud, Election Law § 8-400 (5) provides that statements made in an application for an absentee ballot "shall be accepted for all purposes as the equivalent of an affidavit" and that "a material false statement shall subject the person signing it to the same penalties as if he had been duly sworn." Likewise, Election Law § 7-122 (8) requires absentee voters to subscribe to an oath on the ballot, affirming that they are unable to appear at the polling place on election day.

As the Court observes, however, the election at issue does not implicate the statute's concern with fraud or intentional misconduct. In affirming Supreme Court's decision to invalidate the ballots, the Appellate Division expressly found that the "voters were without fault." (10 AD3d 476, 479 [2004].) No one doubts this. By all indications, when they applied for absentee ballots in the fall of 2003, the absentee voters truthfully stated that they would be unavoidably absent from Albany County.

Moreover, there is no evidence to suggest that, by following the format established by the Board for the special general election, the voters were acting fraudulently. On the contrary, the record reveals that a substantial majority (15 of 27) of the contested ballots were postmarked from outside Albany County. That the remaining 12 ballots originated from within the County is, at best, inconclusive evidence of an irregularity. An otherwise proper absentee ballot may be cast and canvassed, even if the voter is present in the county of residence on election day (*see Matter of Sherwood v Albany County Bd. of Elec-*

*tions*, 265 AD2d 667 [3d Dept 1999]). Furthermore, because their ballots were postmarked 11 to 15 days before the election, these 12 voters may well have been unavoidably absent from Albany County on election day.

To be sure, the voters here departed from the standard absentee ballot application procedures, but only because the Board told them that was the way to do it. Pursuant to the District Court's order, the Board mailed absentee ballots for the special primary election to all voters who had qualified for such ballots in the original general election. When, a month later, the voters received absentee ballots for the special general election, they had no reason to imagine that their ballots would be challenged.

## II.

A faithful reading of the Election Law indicates that we should not disenfranchise these voters for the Board's good faith mistake. In pertinent part, Election Law § 16-106 (1) provides:

> "If the court determines that the person who cast such ballot was entitled to vote at such election, it shall order such ballot to be cast and canvassed if the court finds that ministerial error by the board of elections or any of its employees caused such ballot envelope not to be valid on its face."

The distinction between "ministerial" and "discretionary" acts may be muddied by the particularities of a given case, but in the abstract, the terms describe discrete polarities of official conduct. As Chief Judge Pound explained in *Matter of Wicksel v Cohen* (262 NY 446, 449 [1933]), "[t]he distinction between ministerial and judicial acts is that where the law prescribes the rule to be followed so as to leave nothing to the exercise of judgment or discretion, the act is a ministerial act." By contrast, "where the act involves the exercise of judgment or discretion in determining whether the duty exists, the act is judicial" (*id.*).

Under this framework, the Board's error was quintessentially ministerial. The distribution of absentee ballots is not an activity that requires the exercise of discretion. Election Law § 8-402 unambiguously requires boards of elections to determine whether absentee ballot applicants meet the eligibility criteria set forth by Election Law § 8-400. Election Law § 8-406 further requires boards of elections to mail absentee ballots to all applicants who satisfy the section 8-400 criteria. Here, the record

reveals that the Commissioners thought that the federal court order obligated them to mail absentee ballots for the special general election to every voter who had applied for such a ballot in the fall of 2003.[1] The Board's bipartisan departure from the statutorily prescribed protocol for the issuance of absentee ballots was not so much a willful exercise of independent discretion as a mistaken attempt by the Commissioners to follow the federal court order, as they understood it.

## III.

Even if the Board's error were not strictly ministerial, this Court's decisional law requires counting the contested ballots. In *People ex rel. Hirsh v Wood* (148 NY 142 [1895]), we considered the validity of ballots with a "latent defect" (*id.* at 146). Specifically, a county clerk charged with printing the ballots had inserted into them, without authority, the names of candidates who had not been nominated by their party. Writing for the Court, Chief Judge Andrews stated:

> "We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake *or even the willful misconduct of election officers* in performing the duty cast upon them. The object of elections is to ascertain the popular will and not to thwart it. The object of election laws is to secure the rights of duly qualified electors, and not to defeat them. Statutory regulations are enacted to secure freedom of choice and to prevent fraud, and not by technical obstructions to make the right of voting insecure and difficult" (*id.* at 146-147 [emphasis added]).[2]

The majority has attempted—unsuccessfully in my view—to

---

**1.** Deputy Commissioner Karen Shea testified that the Board issued absentee ballots for the special general election to everyone who had applied for such ballots in September and October of 2003 because "that's what we thought when we read the order from the judge. That's how we interpreted it. . . ." Asked how the Commissioners came to this conclusion, she responded, "I think we went over it in a meeting, that all four of us sat down and we looked it [the District Court order] over, and that's what we thought—you know." John Graziano, a Commissioner, testified that the "decision was [made] in a meeting with the two deputies and the two commissioners in trying to interpret what the judge was asking us to do, and that's what we decided to do. Then we followed up and did it."

**2.** *See also Griffin v Burns*, 570 F2d 1065 (1st Cir 1978) (holding that when a board of elections had no authority to issue absentee ballots for a special primary election, but when the issuance of such ballots followed a

distinguish *Hirsh* from the case before us. It is incontestable, however, that if, under *Hirsh*, votes must be counted when there is outright fraud by election officials, surely they should be counted when a bipartisan board of elections makes an honest mistake.

As this Court observed in *Matter of Staber v Fidler* (65 NY2d 529, 534 [1985]), a lax construction of the Election Law may invite mischief by candidates or "manipulations of the entire election process," but too strict a construction "beyond that necessary for the effectuation of those policies can also lead to injustice." Accordingly, I respectfully dissent.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, GRAFFEO and READ concur in per curiam opinion; Judge ROSENBLATT dissents in a separate opinion in which Judge R.S. SMITH concurs.

Order affirmed, without costs.

---

long-standing practice, it was unconstitutional to invalidate the absentee ballots cast by voters).