[924 NE2d 812, 897 NYS2d 704]

In the Matter of ROBERT T. STEWART, a Candidate for the Public Office of Chautauqua County Legislator, Seventh Legislative District, Respondent, v CHAUTAUQUA COUNTY BOARD OF ELECTIONS et al., Respondents, and LEON H. BEIGHTOL et al., Appellants.

In the Matter of LEON H. BEIGHTOL, a Candidate for the Public Office of Chautauqua County Legislator, Seventh Legislative District, Appellant, v CHAUTAUQUA COUNTY BOARD OF ELECTIONS et al., Respondents, and NORMAN P. GREEN, Appellant.

In the Matter of LEON H. BEIGHTOL, a Candidate for the Public Office of Chautauqua County Legislator, Seventh Legislative District, Appellant, v CHAUTAUQUA COUNTY BOARD OF ELECTIONS et al., Respondents, and NORMAN P. GREEN, Appellant.

Argued February 10, 2010; decided February 23, 2010

**POINTS OF COUNSEL**

*Fessenden, Laumer & DeAngelo,* Jamestown (*Charles S. DeAngelo* of counsel), for Leon H. Beightol, appellant. I. The

two absentee ballots were the product of an improper procedure that culminated in the return of an application that served to unquestionably identify the voter. (*Matter of Gross v Albany County Bd. of Elections,* 3 NY3d 251; *Matter of Altimari v Meisser,* 15 NY2d 686.) II. The court should not validate unscannable ballots. III. J.K. was qualified to vote from the Town of Ellington residence. (*Matter of Hosley v Curry,* 85 NY2d 447, 1033; *People v O'Hara,* 96 NY2d 378; *Matter of Willkie v Delaware County Bd. of Elections,* 55 AD3d 1088; *Matter of Fingar v Martin,* 68 AD3d 1435; *Friedman v State of New York,* 67 NY2d 271; *Matter of Johnson v Simpson,* 43 AD3d 478; *Matter of Gallagher v Dinkins,* 41 AD2d 946; *Matter of Bressler v Holt-Harris,* 37 AD2d 898, 30 NY2d 529; *Matter of Geller v Lasher,* 196 AD2d 613; *Matter of Umland v Board of Elections of City of N.Y.,* 143 AD2d 240.)

*Law Offices of Michael Robert Cerrie,* Dunkirk (*Michael Robert Cerrie* of counsel), for Norman P. Green, appellant. I. The Appellate Division incorrectly determined that the optical scanned ballots in question should be counted. (*Matter of Alessio v Carey,* 49 AD3d 1147, 10 NY3d 803; *Matter of Gross v Albany County Bd. of Elections,* 3 NY3d 251; *Matter of Staber v Fidler,* 65 NY2d 529.) II. The Appellate Division incorrectly determined that J.K. was unable to vote in the district in question. (*Matter of Willkie v Delaware County Bd. of Elections,* 55 AD3d 1088; *Matter of Fingar v Martin,* 68 AD3d 1435; *Matter of Isabella v Hotaling,* 207 AD2d 648, 84 NY2d 801; *Matter of Ferguson v McNab,* 60 NY2d 598; *People v O'Hara,* 96 NY2d 378; *Matter of Gallagher v Dinkins,* 41 AD2d 946, 32 NY2d 839; *Matter of Stavisky v Koo,* 54 AD3d 432; *Matter of Fernandez v Monegro,* 10 AD3d 429; *Matter of Carney v Davignon,* 289 AD2d 1096.) III. The Appellate Division improperly permitted absentee ballots to be counted despite the presence of extraneous identifying material. (*People ex rel. Brown v Keller,* 170 App Div 324, 216 NY 741; *Matter of Alessio v Carey,* 49 AD3d 1147, 10 NY3d 803.)

*Goodell & Rankin,* Jamestown (*Andrew W. Goodell* of counsel), for Brian Abram, respondent. I. A party cannot appeal their own victory. (*Roth v Michelson,* 55 NY2d 278; *Town of Massena v Niagara Mohawk Power Corp.,* 45 NY2d 482; *Matter of Brown v Starkweather,* 197 AD2d 840, 82 NY2d 653; *Matter of Harry Y.,* 62 AD3d 892; *DiMare v O'Rourke,* 35 AD3d 346; *Matter of Martin v C. A. Prods. Co.,* 8 NY2d 226; *Matter of Hartsdale Fire Dist. v Eastland Constr., Inc.,* 65 AD3d 1345; *Maas v*

*Cornell Univ.,* 253 AD2d 1, 94 NY2d 87.) II. A party must raise known objections to a ballot before it is counted. (*Matter of Gross v Albany County Bd. of Elections,* 3 NY3d 251; *Sheils v Flynn,* 275 NY 446; *Matter of Stevenson v Power,* 27 NY2d 152; *People v Buckley,* 75 NY2d 843; *People v Cook,* 286 AD2d 917, 97 NY2d 680; *People v Klavoon,* 207 AD2d 979, 84 NY2d 908; *People v Thompson,* 59 AD3d 1115; *Matter of City of Utica v Town of Frankfort,* 10 NY3d 128.) III. The inclusion of the application in the same envelope as the ballot does not invalidate the ballot. (*Cahen v Boyland,* 1 NY2d 8; *Matter of Altimari v Meisser,* 22 AD2d 933, 15 NY2d 686, 847, 854; *Matter of Pavlic v Haley,* 40 Misc 2d 975, 20 AD2d 592, 13 NY2d 1111; *People ex rel. Brown v Keller,* 170 App Div 324, 216 NY 741; *People v O'Hara,* 96 NY2d 378; *Matter of Palla v Suffolk County Bd. of Elections,* 31 NY2d 36; *Matter of Graziano v County of Albany,* 3 NY3d 475; *Matter of Ferguson v McNab,* 60 NY2d 598; *Matter of Isabella v Hotaling,* 207 AD2d 648, 84 NY2d 801; *Friedman v State of New York,* 67 NY2d 271.)

*Michael J. Sullivan,* Fredonia, for Robert T. Stewart, respondent. I. The optical scan ballots left by voters at the optical scan machine should be counted since the voters' intent was clear and the chain of custody of the ballot was preserved. (*Bingham v New York City Tr. Auth.,* 99 NY2d 355.) II. The ballot of J.K. was improperly counted, as she was not a resident qualified to vote in the Town of Ellington on November 3, 2009. (*Palla v Suffolk County Bd. of Elections,* 38 AD2d 84, 30 NY2d 481, 31 NY2d 36; *People v O'Hara,* 96 NY2d 378; *Matter of Willkie v Delaware County Bd. of Elections,* 55 AD3d 1088; *Matter of Hosley v Curry,* 85 NY2d 447; *Matter of Markowitz v Gumbs,* 122 AD2d 906; *Matter of Fernandez v Monegro,* 10 AD3d 429; *Matter of Carney v Davignon,* 289 AD2d 1096; *Matter of Altimari v Meisser,* 45 Misc 2d 1008, 23 AD2d 865, 16 NY2d 629.) III. Two absentee ballots cast and canvassed on November 30, 2009 should be counted. (*Matter of Gross v Albany County Bd. of Elections,* 3 NY3d 251; *People ex rel. Brown v Keller,* 170 App Div 324, 216 NY 741; *Parochial Bus Sys. v Board of Educ. of City of N.Y.,* 60 NY2d 539.)

**OPINION OF THE COURT**

Per Curiam.

I.

These three related proceedings were commenced pursuant to article 16 of the Election Law following the general election for

the position of Chautauqua County Legislator for the Seventh District. Robert T. Stewart, the Republican and Independence Party candidate, commenced the first proceeding challenging, as relevant here, one affidavit ballot on the ground that the voter, J.K., was not a resident of the voting district. Stewart also challenged two absentee ballots, on the ground that the "absentee ballot applications submitted by [the two] voters were rejected by the . . . Board of Elections [and c]orrections were not received prior to sending the ballot or upon the return of the ballot." At that point, the two absentee ballot envelopes at issue had not yet been opened. Leon H. Beightol, the incumbent Democratic and Working Families Party candidate, answered and asserted counterclaims. As relevant here, Beightol sought to have Supreme Court validate the affidavit ballot of J.K. and "open and count" the two absentee ballots.

At a hearing on the first petition on November 30, 2009, Supreme Court directed the Board of Elections to open the two absentee ballot envelopes to ascertain the contents of the envelopes. Each of the two envelopes contained one completed absentee ballot application and one completed absentee ballot. To the parties' apparent surprise, both ballots were cast in favor of Stewart. Thereafter, Beightol commenced the second of these three proceedings. Altering the position he took in the first proceeding, Beightol sought to have Supreme Court invalidate the two absentee ballots on the ground that extrinsic material which could identify the voters, i.e., their absentee voter applications, was included along with the voters' absentee ballots in the ballot envelopes. As relevant here, Beightol also sought the invalidation of two optical scan ballots—manually counted by the Board of Elections on November 18, 2009—that he claimed were "abandoned" at one polling site. In his answer, Stewart, also altering his original position, argued that the two absentee ballots should be counted. Stewart additionally argued that the optical scan ballots were properly counted during the hand count on December 8, 2009.

Shortly thereafter, Beightol commenced the third proceeding, challenging the optical scan ballots on the ground that they were abandoned. He also challenged whether chain of custody controls were properly used with respect to the two optical scan ballots.

After a December 9, 2009 hearing, Supreme Court ordered that J.K.'s affidavit ballot and the two absentee ballots be

counted and that the two optical scan ballots not be counted. As to the affidavit ballot, the court concluded that J.K. "properly . . . cast her ballot in the location where she had significant contacts . . . of a kind and nature which would have allowed her to vote from that district on that date." Addressing the two absentee ballots, the court first noted that "[a]n absentee ballot should not be mailed out [until] the [absentee ballot] application is complete." By sending the two absentee ballots, the court concluded that the Board of Elections had "deemed the . . . application to be complete." The court further concluded that the extrinsic materials included with the ballots in the absentee ballot envelopes were the result of a ministerial error by the Board of Elections. Finally, with respect to the optical scan ballots, the court concluded, without reaching Beightol's chain of custody arguments, that the voters had abandoned their ballots by leaving the polling place without ensuring their votes had been counted. Supreme Court's order resulted in a tie vote.

As relevant here, Stewart appealed from so much of Supreme Court's order as directed the Board of Elections to count J.K.'s affidavit ballot and invalidated the Board of Elections' hand count of the two optical scan ballots. Beightol cross-appealed from so much of Supreme Court's order as directed the "opening and counting" of the two absentee ballots.

The Appellate Division, with two Justices dissenting in part, dismissed Beightol's cross appeal from Supreme Court's order "insofar as it directed the opening of the two absentee ballots," modified the order, on the law, by invalidating J.K.'s affidavit ballot and validating the two optical scan ballots, and, as modified, affirmed (*see Matter of Stewart v Chautauqua County Bd. of Elections*, 69 AD3d 1298, 1299 [4th Dept 2010]). The Appellate Division majority agreed with Supreme Court's factual findings on the issue of J.K.'s residency but held, as a matter of law, that J.K. resided at an address outside the voting district. With respect to the optical scan ballots, the court, relying on 9 NYCRR 6210.13 (A) (11), concluded that the ballots were not "abandoned" within the meaning of that regulation and were properly counted during the Board of Elections' hand count.

As to the two absentee ballots, the court first characterized Beightol's cross appeal as "contend[ing] . . . that [Supreme C]ourt erred in ordering that the two absentee ballots . . . be opened" (*id.* at 1302). Because the Appellate Division determined that Beightol had previously sought to have the absentee ballots opened, and Supreme Court had ordered the Board to

open the ballots, the Appellate Division concluded that Beightol was not aggrieved by that part of Supreme Court's order. The court further determined that Beightol was judicially estopped from taking the position in his two proceedings and on appeal that the absentee ballots should not be counted because that position was "contrary to his position in the proceeding commenced by Stewart" (*id.* at 1303). Finally, the court rejected Beightol's argument that extrinsic materials included with the absentee ballots invalidated those ballots. After the Appellate Division decision, Stewart led by three votes.

Beightol appealed as of right, pursuant to CPLR 5601 (a), from the Appellate Division order of modification,[1] and we now affirm.[2]

## II.

### A. J.K.'s Affidavit Ballot

Election Law § 1-104 (22) defines "residence" as "that place where a person maintains a fixed, permanent and principal home and to which he [or she], wherever temporarily located, always intends to return." To be a resident of a place within the meaning of the Election Law, we have held that "a person must be physically present with the intent to remain for a time" (*People v O'Hara*, 96 NY2d 378, 384 [2001], citing *Matter of Palla v Suffolk County Bd. of Elections*, 31 NY2d 36, 47 [1972]). While a voter may have more than one "bona fide residence," he or she may not "create an address" merely to "circumvent[ ] residency requirements" (*id.* at 384, 385 [citations omitted]). In *O'Hara*, we explained:

> "[A]n individual having two residences may choose
> one to which [he or] she has 'legitimate, significant

1. We denied Beightol's motion for leave to appeal as unnecessary and granted his motion for a stay of enforcement of the Appellate Division order (*see* 14 NY3d 740 [2010]).

2. Each of the three proceedings named as respondents, in addition to the opposing candidate, the Board of Elections, Brian Abram, the Republican member of the Board, and Norman Green, the Democratic member of the Board. At Supreme Court and on appeal, the Republican member of the Board asserted arguments identical to Stewart's position; the Democratic member of the Board asserted arguments identical to Beightol's position. Green sought leave to appeal and appealed as of right from the Appellate Division order. Assuming without deciding that Green has standing to appeal without Abram's permission (*see Matter of Graziano v County of Albany*, 3 NY3d 475 [2004]), our holdings with respect to Beightol's arguments apply equally to Green's arguments.

and continuing attachments as [his or] her residence for purposes of the Election Law.' Generally, where there is no reason to assume that a residence has been asserted merely for the purposes of voting, where no fraud or deception has been practiced and where there is a history of the residence employed, the courts have upheld a fact-finder's determination of residency" (96 NY2d at 385, quoting *Matter of Ferguson v McNab*, 60 NY2d 598, 600 [1983]; *see also Matter of Gallagher v Dinkins*, 41 AD2d 946, 947 [2d Dept 1973], *affd* 32 NY2d 839 [1973]).

The record here establishes that J.K. did not have dual residences in Chautauqua and Cattauragus Counties. Although J.K. testified that she stayed at the Chautauqua County house for three consecutive summers and hoped to return for a fourth, she further testified that she did not own the home, did not pay rent, might not be permitted to return because her aunt could decide to sell the property before the next summer, that the electrical supply was shut off as of August 2009, and that the house had no running water or heat source. The record also establishes that J.K. resided in the Cattaraugus County apartment. Notably, when asked how long she intended to reside at the Cattaraugus County apartment, J.K. testified that she hoped to stay there "permanent[ly]." As a matter of law, J.K.'s physical presence at her Cattaraugus County apartment, coupled with her expressed intent to remain there permanently, sufficed to establish that as her residence. Moreover, J.K. lacked "significant and continuing" attachments to the Chautauqua County address sufficient to create a bona fide second residence for the purpose of voting. Accordingly, we conclude, as a matter of law, that J.K. was not a resident of the voting district and the affidavit ballot must be invalidated.

B. Optical Scan Ballots

Chautauqua County was one of several counties statewide that used new optical scan voting machines for the first time in the November 2009 general election in conformance with federal mandates. Under this system, the voter completes a paper ballot in a privacy booth by using a pen or pencil to identify the chosen candidates. The voter then brings the ballot to an optical scan machine and the ballot is fed into the device, which "reads" the document and records the vote. The technology is not foolproof, however, and the machine is sometimes unable to record the votes identified on the ballot for various reasons,

including deviation by the voter from the recommended manner of marking the boxes on the form, causing some ballots to be rejected by the machine as unreadable.

In this case, at the end of the general election day, there were two ballots at a polling place that had been completed by voters but were rejected as unreadable by the optical scan machine. Testimony given by one election inspector from that polling site established that one voter left immediately after feeding his ballot into the machine, before learning of the machine's rejection of the ballot. The voter who filled out the second ballot was aware that his ballot was not scanned by the machine but he declined to fill out a new ballot. The election inspector's testimony nonetheless made clear that the voter did not intend to abandon his vote. For both ballots, a bipartisan team of inspectors attempted to rescan the ballot. When the attempt was unsuccessful, an election inspector then secured the ballot in the emergency slot of the optical scan machine. At the end of the day, the ballots were delivered to the Board of Elections in a specially designated envelope.

■ We agree with the Appellate Division that the Board of Elections properly hand-counted the two unscanned optical scan ballots. The applicable regulation, which "appl[ies] in determining whether a ballot has been properly voted and whether a vote should be counted," provides: "If a voter leaves the voting machine or system without casting their ballot, a bipartisan team of election inspectors shall cause the ballot to be cast as the voter left it, without examining the ballot" (9 NYCRR 6210.13 [A] [11] [a]). If the voter leaves a ballot "in a privacy booth" without casting the ballot, the ballot is spoiled (9 NYCRR 6210.13 [A] [11] [b]). But, if a ballot is "non-machine processable as submitted by the voter, [it] shall be manually counted by a bipartisan team of election inspectors and such vote totals shall be added to the canvass" (9 NYCRR 6210.13 [A] [8]).

Here, no party contends that the ballots were left in a "privacy booth." Rather, the voters left their completed ballots at the machines without ensuring that their ballots had been scanned. Pursuant to the express language of the applicable regulations, because the ballots were "non-machine processable as submitted by the voter[s]," the votes were required to be manually counted and added to the canvass. The process utilized by the election inspectors here, which ultimately culminated in a manual count of the ballots by the Board of Elections, complied with the provisions of the applicable regulations and was, therefore, proper.

Beightol's argument that the optical scan ballots could not be hand-counted because the voters' marks overran the squares for designating a candidate lacks merit. One ballot contained check marks inserted within the squares instead of completely penciled-in squares. The other optical scan ballot contained some marks that overran the squares. However, the applicable regulations specifically provide:

"A vote for any candidate or ballot measure shall not be rejected solely because the voter failed to follow instructions for marking the ballot . . .

"A mark is considered valid when it is clear that it represents the voter's choice and is the technique consistently used by the voter to indicate his or her selections. Such marks may include, but are not limited to, properly filled in voting position targets, cross mark 'X', a checkmark '[Checkmark]', circles, completed open arrow '[Left Pointing Arrow]', or any other clear indication of the voter's choice" (9 NYCRR 6210.13 [A] [2], [3]).

Here, the ballots clearly indicate the voters' selections for candidates and, therefore, should be counted. Accordingly, we conclude that the two optical scan ballots were valid and should be counted.

C. Absentee Ballots

As a preliminary matter, we agree with the Appellate Division that Beightol was not aggrieved by so much of Supreme Court's determination as directed the opening of the absentee ballot envelopes. In the first proceeding, Stewart sought a determination that the two absentee ballot envelopes should not be opened or the ballots counted. In response, Beightol argued that the ballot envelopes should be opened. Given that Supreme Court ordered the ballot envelopes opened, Beightol is not aggrieved by that part of the determination. He is aggrieved, however, by so much of the order as directed that the ballots be counted, and we therefore consider his objections to that ruling.

Beightol was not judicially estopped from adopting the position that the absentee ballots were invalid. We note that Stewart, like Beightol, adopted a different position once the absentee ballot envelopes were opened, in both the first proceeding and in the subsequent proceedings; Stewart can hardly assert that he was prejudiced when Beightol merely adopted Stewart's original position (*see generally Shepardson v Town of Schodack*, 195

AD2d 630, 632 [3d Dept 1993], *affd* 83 NY2d 894 [1994]). Further, it is not clear on this record that Beightol was successful in persuading Supreme Court to adopt his initial position (*see Zedner v United States*, 547 US 489, 504 [2006]). Thus, we conclude that the doctrine of judicial estoppel is inapplicable, and we turn to the merits of Beightol's argument that the two absentee ballots submitted by R.Y. and W.Y. are invalid and should not be counted.

On the merits, Beightol first argues that the absentee ballots should not be counted because the Board did not receive completed absentee ballot applications prior to sending the absentee ballots to these two voters. Relying on *Matter of Gross v Albany County Bd. of Elections* (3 NY3d 251 [2004]), Beightol contends that the Board of Elections' error was not merely technical or ministerial, and its failure to adhere to the provisions of the Election Law requires the invalidation of the two absentee ballots. We disagree.

The Election Law describes in detail the appropriate procedure for the issuance of absentee ballots (*see* Election Law § 8-400; *see also Gross*, 3 NY3d at 256). Before a voter may cast an absentee ballot, he or she must complete an absentee ballot application (*see* Election Law § 8-400 [2]). The application must include certain information; for example, the voter must specify the reason for his or her absence from the voting district, the duration of that absence, and that he or she is qualified and registered to vote in the election district for which the absentee ballot is sought (*see* § 8-400 [3] [b], [c]). Applications for absentee ballots "must be mailed to the board of elections not later than the seventh day before the election for which a ballot is first requested or delivered to such board not later than the day before such election" (§ 8-400 [2] [c]). When a local board of elections receives an application for an absentee ballot, the board determines "upon such inquiry as it deems proper whether the applicant is qualified to vote and to receive an absentee ballot" (§ 8-402 [1], [2]), and, if it is satisfied by its inquiry, the absentee ballot is then forwarded to the voter (*see Gross*, 3 NY3d at 256).

In *Gross*, we emphasized the need for compliance with the framework specified in the absentee ballot provisions (*see id.* at 258). In that case, the Board of Elections, rather than following the particularized requirements of the Election Law, forwarded an absentee ballot for an April 2004 special general election to any voter who had requested one in the November 2003 general

election without requiring an absentee ballot application from each voter (*see id.* at 254). We concluded that the Board's mistake could not be "characterized as technical, ministerial or inconsequential because it was central to the substantive process by which voters are determined to be qualified to cast absentee ballots" (*id.* at 258-259). Specifically, we observed that the Board's error resulted in an uneven application of the Election Law, because some voters were required to comply with the absentee voter application process, while others were not. We were also particularly concerned that the challenged absentee votes were cast by voters who were never made to "articulate[ ] why they were not able to vote at the polls" (*id.* at 259). Thus, because of the Board of Elections' failure to ascertain whether the voters were duly qualified to cast absentee ballots, we concluded that the Board's mistake warranted the invalidation of the challenged absentee ballots.

The concerns that motivated our holding in *Gross* are not present here. In this case, the record indicates that the Board received applications for absentee ballots from both voters within the applicable time period before the election. However, the applications did not contain necessary information; specifically, the applications failed to state where the voters would be at the time of the election and the dates of their absence from the district. The Board thereafter mailed absentee ballots to both voters with instructions to return the completed application together "with [the absentee] ballot or [the] ballot will not be counted." Both voters did, in fact, return their completed absentee ballot applications with their absentee ballots. The applications were examined separately to ascertain the qualification of each voter to cast an absentee ballot. Thus, the Board here, unlike the Board of Elections in *Gross*, did have a basis upon which to determine that the two voters were entitled to vote as absentee voters.

The Board has conceded that the procedure it utilized here was not the best method of complying with the requirements of the Election Law and that it will not use these procedures again in the future. However, unlike the mistakes committed by the Board of Elections in *Gross*, the slight deviation from the prescribed procedure utilized by the Board "can be viewed as substantial compliance with statutory directives" (*Gross*, 3 NY3d at 259). The defect in the procedure was not a "substantive deficiency implicating voter qualification" (*id.* at 259 n 3).

Finally, Beightol's argument that the absentee ballots were void because the absentee ballot envelopes contained

extrinsic materials identifying the voters lacks merit. We agree with the Appellate Division that the absentee ballots were not invalidated by the presence of the absentee ballot applications, because no marks on the ballots themselves identified the voters (*see* Election Law § 9-112 [1]; *see also Matter of Altimari v Meisser*, 15 NY2d 686, 687 [1965], *modfg* 22 AD2d 933 [2d Dept 1964], *rearg denied and remittitur amended* 15 NY2d 847 [1965]).

### III.

In sum, we hold that J.K.'s affidavit ballot was invalid, the two optical scan ballots were valid and should be counted, and the two absentee ballots were valid and should be counted. Accordingly, the order of the Appellate Division should be affirmed, without costs.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur in per curiam opinion.

Order affirmed, without costs.