OPINION OF THE COURT
Paul I. Makx, J.
These two Election Law proceedings were commenced simultaneously, or nearly so, by Richard J. Smith[1] and Roseanne Sullivan,[2] the candidates in the special election[3] for the office of county legislator in the 18th District of Orange County, each of whom presented an order to show cause to me for signature on November 19, 2012. In essence, each candidate seeks the disqualification and nullification of certain ballots cast, but not yet counted, in the election held on November 6, 2012, for that office. In addition, because of unusual circumstances surrounding the casting of ballots at the Bullville fire station, circumstances that this court would hope will not ever be repeated, candidate Smith seeks to have this court order certain voters who were given incorrect ballots on election day be allowed to cast affidavit ballots for that office. The reasons for that request are discussed more fully below. Suffice it to say that such a request presents a case of first impression. Except as noted herein, each party has opposed the other’s application.
On the court’s own motion, the two proceedings are consolidated for disposition.
On December 4, 2012, this court held a hearing on the parties’ applications.
Status of the Contested Election
This is a tight race. At the commencement of these proceedings Smith trailed by four votes. Smith withdrew certain challenges both before and during the morning session of the hearing. The parties counted those ballots that they both agreed, and the court ruled, should be counted at the court’s lunch *730 recess.[4] As a result, by the time of the afternoon session and at the time of the writing of this decision, Smith trails by 12 votes. This is the exact number of votes which remain subject to the parties’ challenges (two by Sullivan; 10 by Smith). Hence, if this court invalidates even one vote on either party’s application, Smith cannot possibly prevail in this election. Nevertheless, he asks the court to disqualify 10 ballots. Thus, although he could have withdrawn his challenge to those votes and, perhaps, saved a chance at victory, or at least a tie, if he “ran the table,” he chose otherwise. I must conclude, therefore, that he seeks either a pyrrhic victory or to create law relating to the Bullville error which is more fully described below. Curiously, Sullivan has not withdrawn her opposition to the ballots which Smith wants disqualified even though doing so would guaranty her victory by rendering it mathematically impossible for Smith to garner enough votes to close the current gap.
Leaving their respective strategies to them, based on the evidence presented to me at a hearing held on December 4, 2012, the oral arguments of counsel and their various legal memoranda, I hold as follows:
I. The Sullivan Application
Sullivan moves to have the court declare as null and void two ballots on the basis that each of them contains extraneous marks. The extraneous marks, according to Sullivan, mandate the rejection of the ballots. Smith opposes that application.
As a preliminary matter, the court notes that Smith’s counsel contends that only one ballot was actually contested by Sullivan and that the other was contested by Election Commissioner Bahren. At oral argument Sullivan’s counsel asserted, as an officer of the court, that he had joined Commissioner Bahren’s objection. The answer submitted on behalf of the Orange County Board of Elections and the commissioners for both major political parties states that Sullivan’s counsel objected to two ballots.[5] Accordingly, the court finds that Sullivan objected to both of the contested ballots.
*731 Smith opposes Sullivan’s petition, asserting that she does not sufficiently identify the claimed defects of these ballots in her petition. He also asserts that any extra marks that appear on the ballots were not pertinent to the casting of the votes in this race and, therefore, the votes cast in this race should be counted.
As to the first of Smith’s contentions regarding the sufficiency of Sullivan’s petition, fundamental fairness dictates that a party should know, in advance, which ballots are being challenged and the basis for the challenge so that the party opposing the application can be prepared to rebut those claims. In her petition, Sullivan placed Smith on notice of her intention to challenge two ballots (1i 5) and the basis for that challenge. At paragraph 6 of her petition, she states that “[t]he objections involved marking on the ballots”; “extraneous marks on the ballots”; “irregular markings.” Unlike the facts in Matter of Krueger v Richards (59 NY2d 680 [1983]), Smith has not been surprised by a last minute objection voiced by Sullivan at the hearing and has had adequate time to prepare to rebut Sullivan’s application to disqualify the votes.
I hold that the petition sufficiently identifies the claimed defects with the ballots as involving extraneous markings and that such allegations gave sufficient notice to Smith as to the nature of the challenge mounted. The claimed defects on the challenged ballots fall within the general category of extraneous markings. As such, I will address the merits of that challenge.
Election Law § 9-112 (1) provides, in pertinent part:
“The whole ballot is void if the voter (a) does any act extrinsic to the ballot such as enclosing any paper or other article in the folded ballot or (b) defaces or tears the ballot ...(c) makes any erasure thereon or (d) makes any mark thereon other than a cross X mark or a check V mark in a voting square, or filling in the voting square, or punching a hole in the voting square of a ballot intended to be counted by machine or (e) writes, other than in the space provided, a name for the purpose of voting; except that an erasure or a mark other than a valid mark made in a voting square shall not make the ballot void, but shall render it blank as to the office, party position or ballot proposal in connection with which it is made” (Emphasis added.)
*732 A. Objected Ballot No. 1
For her first challenge, Sullivan urges that a ballot, which has been admitted into evidence as exhibit K-l, should be rejected and nullified because the word “Abandon” has been scrawled across its face.
The law is clear that “[w]here . . . ‘there were written words deliberately placed on the ballot by the voter’ the entire ballot is void.” (Matter of Mondello v Nassau County Bd. of Elections, 6 AD3d 18, 25 [2d Dept 2004] [emphasis added], quoting Matter of Scanlon v Savago, 160 AD2d 1162, 1163 [3d Dept 1990] [citations omitted].) Hence, if the word “Abandon” was, in fact, written on the ballot by the voter, the ballot would clearly be void and of no effect.
At the hearing, counsel for the Board of Elections advised the court that “Abandoned” is a term of art used where ballots are completed and cannot be associated with a voter and that when such ballots are found on a voting machine unattended,[6] they are marked “Abandoned” and are placed into an “Abandoned Ballot Bag.” The ballot in question bears a sticker that reads “Objected to by Jacobson, From Abandoned Ballot Bag.” The proof therefore compels the conclusion that this ballot was, in fact, retrieved from the abandoned ballot bag.
Sullivan’s counsel asserted at the hearing that, generally, where a ballot is abandoned, the word “Abandon” would be written on the rear of the ballot.[7] While this may be true as a general proposition, counsel for the Board of Elections advised that the word can be written on either the front or the rear and that there is no clear practice in place with respect to where the word should be written. Clearly, better practice would be for election workers who discover a ballot believed to be “abandoned” to write the word on the rear so as not to create extraneous marks on the face. Doing so would avoid confusion as to whether markings were made on a ballot by a voter or an election worker. Even better practice would be for the election worker to actually write a brief explanation on the rear indicating the time and location where the ballot was found so that a *733 clear determination of the factual scenario under which the ballot was found could be made by a court at a later date, if necessary. Had such a method been in place for this election, the parties and the court would have greater certitude as to the relevant circumstances.
On its own motion, the court directs the Orange County -Board of Elections commissioners to develop and implement a consistent procedure and method throughout the county for the identification and marking of ballots believed to be abandoned.[8] Election poll workers shall be instructed, as part of their preelection training, as to the procedure and method developed. This will avoid circumstances like this one where a court is called upon to determine who scrawled the word “Abandon” across the face of a ballot.
I note that the utilization of the word “Abandon,” a term of art used by electioneers, if made by an individual voter would seem a remarkable coincidence. The use of this term of art on the ballot is, in this court’s opinion, simply far too coincidental to have not been the product of an election worker. Hence, the court concludes, as the finder of fact, that the ballot was, in fact, marked by an election worker and, therefore, the marking on it is not an extraneous stray mark by a voter that warrants nullification of the ballot.
As to the subject contest, the ballot is to be counted.
B. Objected Ballot No. 2
Next, Sullivan urges that a ballot, admitted into evidence as exhibit L-l and L-2 (front and rear), should be negated and not counted because in boxes No. 3C and No. 4C, a diagonal line has been drawn by someone across the names of two candidates for the position of justice of the supreme court.[9] It is this ballot that Smith contends was not objected to by Sullivan.
Sullivan asserts that the presence of these diagonal marks on the ballot renders the ballot void in its entirety. Since the claimed extra marks consist of lines drawn through the two boxes of the candidates for supreme court on the Conservative *734 Party line only, the ballot should not be voided in its entirety. At most, the stray marks might render “the ballot blank with respect to that office, namely [supreme court justice], but not as to the entire ballot.” (See Matter of Mondello, 6 AD3d at 24; see also Matter of Brilliant v Gamache, 25 AD3d 605, 606 [2d Dept 2006] [“a mark other than a valid mark made in a voting square shall not make the ballot void, but shall render it blank as to the office, party position or ballot proposal in connection with which it is made”].) Here, it is apparent that the voter cast his/ her ballot for all of the Republican candidates and then, for whatever reason, also voted for several of them on the Conservative line. For reasons not clear, the voter then struck the diagonal line through the square containing the names of two supreme court candidates on the Conservative line. No such error occurred on the county legislator column where only one vote was cast. In any event, the voting machine would only record one of the votes for any candidate where a voter attempted to vote twice for that same candidate. Hence, I find the ballot to be void only as to the office of justice of the supreme court.
As to the subject contest, the ballot is to be counted.[10]
II. The Smith Application
Smith requests two different forms of relief. On the one hand, he urges the court to disqualify and declare certain votes null and void. On the other hand, he urges the court to “establish a process to ensure that the 53 voters who were given the wrong ballots when they appeared at the polling place . . . are granted an opportunity to vote.” [11] (Smith petition 1i 3 [c].)
A. The Challenged Votes
Smith challenges votes cast in four separate categories.[12] In category one were three ballots challenged on the basis of residency. In category two were six ballots cast either as *735 absentee ballots issued to members of the public or special ballots issued to poll workers. In category three were six absentee ballots which Smith, relying on purported handwriting discrepancies, contended were either not applied for or were not submitted by the registered voter. Finally, in category four were 27 affidavit ballots which were completed by voters who, after voting on a voting machine, returned to vote by affidavit ballot as to the subject county legislator race for reasons described below.
1. The Group One Challenge
Although Smith objected to three ballots on the basis that he believed that the individuals who cast them did not reside in the legislative district while the paper ballots were being counted, he has since withdrawn those objections and the ballots have now been counted.
2. The Group Two Challenge
As indicated above, category two includes six ballots cast by either absentee ballot or special ballot. These were challenged on the basis that, as to the four absentee ballots, the applications were incomplete and, as to the two special ballots issued to election workers, the election workers failed to indicate on the ballots the reason the special ballots were warranted.
The first ballot challenged is that of a voter who will be identified here as T.G.[13] Admitted into evidence as exhibits E-l, E-2 and E-3 were the front of the absentee ballot envelope, the rear of the absentee ballot envelope and the absentee ballot application, respectively. This vote is challenged because the voter did not sign the application for an absentee ballot.
The second through fourth ballots of S.H., F.H. and W.Z. are challenged because each of the applications fails to include the reason an absentee ballot was being sought. The front of the absentee ballot envelope, the rear of the absentee ballot envelope and the absentee ballot application for each of these has been admitted into evidence as exhibits F-l, F-2, F-3; G-l, G-2, G-3, H-l, H-2 and H-3 respectively.
The fifth and sixth ballots challenged in this category are those cast by E.L. and T.L. These ballots have been marked into evidence along with the front and rear of the special ballot en *736 velope and the special ballot application as exhibits 1-1, 1-2, 1-3 and J-l, J-2 and J-3 respectively. Each ballot is being challenged because the voter’s special ballot application did not indicate the reason that a special ballot was required.
a. Absentee Ballots/Applications of First Four Voters
Election Law § 8-406 requires the Board of Elections to assess the validity of applications for absentee ballots submitted and to issue ballots to applicants who qualify for absentee voter status. The Board’s determination whether a voter is entitled to an absentee ballot is limited to an examination of the application. (Sheils v Flynn, 164 Misc 302, 316 [1937], affd 252 App Div 238 [3d Dept 1937], affd 275 NY 446 [1937].) Where applications are deemed to be defective, they are “of no force or effect. They d[o] not give the board of elections jurisdiction or the right to deliver to the applicant an absentee ballot. Neither d[o] [they] give to the voter the right to vote such absentee ballot.” (Matter of Baker, 126 Misc 49, 53 [Sup Ct, Oneida County 1925], affd 215 App Div 791 [1925].)
In response to Smith’s challenge, Sullivan argues that the voters should not be disenfranchised by the errors of Board of Elections representatives who issued the absentee ballots to the voters and that substantial compliance should suffice. As much as this court would like to enfranchise these voters, Election Law § 8-400 (3) provides that the application must contain certain information, most notably, the reason the application is requested, i.e., “absent from the county of his or her residence,” “unable to appear at a polling place because of illness or physical disability” {id. § 8-400 [3] [i], [ii]), and the signature of the applicant.
Both commissioners of the Board of Elections state in their affidavits that the errors in the above absentee ballot applications occurred at the counter and that staff members had determined that the voters were entitled to vote. {See aff of Susan A. Bahren If 5; aff of David C. Green 1f 3 [adopting the statements of Susan A. Bahren].) How can the court rely on the hearsay conclusions of the elections commissioners to report that these four voters, to whom absentee ballots were issued, were duly qualified? Indeed, unless the Board of Elections workers who actually issued the ballots were called to testify and had independent recollections of their interactions with these voters, proof as to the voters’ qualifications and/or reasons for the issuance of the absentee ballot would be the result of nothing more than speculation.
*737 In this court’s opinion, the statements of the elections commissioners and the testimony by the involved Board of Elections workers, if offered, are not enough to negate the statutory requirements. “Under article 8, in order to become qualified to cast an absentee vote, the voter must file an application requesting an absentee ballot that particularizes why the voter is unable to vote at the polls on election day.” (Matter of Gross v Albany County Bd. of Elections, 3 NY3d 251, 254 [2004].) These voters failed to establish their entitlement to an absentee ballot.
The Board’s errors in ostensibly accepting oral representations of the voters’ unavailability on election day and not requiring them to complete the application by particularizing the reason they were unable to vote on election day “simply cannot be characterized as technical, ministerial or inconsequential because it was central to the substantive process by which voters are determined to be qualified to cast absentee ballots.” (Id. at 258-259.) As Matter of Gross clearly holds, that qualification process must be substantiated with an absentee ballot application and cannot be based upon general knowledge held by the Board that a voter may qualify for that status. In order for the application itself to have the significance given to it by the Court of Appeals in Matter of Gross, it follows that the application must show that the voter qualifies for an absentee ballot. The failure to meet that threshold requirement by checking one of the bases of unavailability printed on the application invalidates the entire application as an absentee ballot application. Thereafter, the provision of an absentee ballot to the voter based on a patently insufficient application transforms the ballot to early voting, which is not permitted in New York State.
Further, referring to the Board of Elections’ obligations with respect to absentee ballots under Election Law § 8-400 et seq., the Court of Appeals held in Gross that absentee ballots are void where they are issued in derogation of all statutory authority. Here, the ballots issued were not consistent with, and were in derogation of, the Board’s responsibilities. “In addition, as a result of the Board’s actions, the absentee ballot rules were not applied uniformly to all who voted in the [subject] election— some voters were required to comply with the application requirement while others (those who cast the ballots at issue) were excused from doing so.” (Matter of Gross, 3 NY3d at 259.)
The court is not unmindful that certain cases allow for substantial compliance with the absentee ballot application procedure and the voter has been allowed to rely on the Board of *738 Elections worker’s actions to ensure his/her vote is counted. Indeed, “wherever reasonably possible,” technical errors should be transcended so as to safeguard a voter’s right to have his or her intent implemented and his or her vote counted. (See Matter of Weinberger v Jackson 28 AD2d 559, 559 [2d Dept 1967], affd 19 NY2d 995 [1967].) Thus have courts found certain omissions were not fatal and allowed the ballot to be accepted. All such instances, however, have been “instances [of] inconsequential deviations from the letter of the law” (Matter of Gross, 3 NY3d at 258) and technical irregularities. For example, where a voter asserted unavailability but failed to include where he/she would be at the time of the election and dates he/she would be absent from the district, the voter’s absentee ballot was validated. (Matter of Stewart v Chautauqua County Bd. of Elections, 14 NY3d 139, 151-152 [2010].) The failure of the applicant to provide the name of the applicant’s physician similarly failed to negate an absentee ballot. (Matter of Gross v Albany County Bd. of Elections, 10 AD3d 476, 479 [3d Dept 2004], affd 3 NY3d 251 [2004]; Matter of St. John v Board of Elections of County of Albany, 145 Misc 2d 324 [Sup Ct, Albany County 1989].) The Appellate Division in Sheils also declined to disenfranchise a voter based upon the failure to sufficiently specify the reasons for the voter’s absence from the voting district. None of these cases go to the core requirements of article 8 of the Election Law.
“[A] too-liberal construction of the Election Law has the potential for inviting mischief on the part of candidates, or their supporters or aides, or worse still, manipulations of the entire election process.” (Matter of Gross, 10 AD3d at 478-479.) Hence, the rationale behind requiring an application to be properly completed is to ensure that no candidate or his/her supporter manipulates the system by issuing ballots that ought not to be issued and/or not issuing others that should be. In the instant case no one has implied that any election worker intentionally did or did not require a completed form in order to favor a candidate. Rather, the errors have been attributed to human error.
Notwithstanding the courts’ willingness to allow technical irregularities at the margins, the core requirements that go to voter qualification must be met. Thus, the failure by the voter to give a reason why they were unable to vote at the polls as well as irregularities with the applicant’s signature were held to render those applications incomplete and insufficient. (See Mat *739 ter of Gross v Albany County Bd. of Elections, 10 AD3d at 479-480.)
Similarly, the absentee ballots challenged by Smith must be invalidated as they are predicated upon incomplete and insufficient applications that are fatally defective. As to T.G.’s ballot, the application for the absentee ballot was unsigned rendering the application a nullity. It cannot fairly be said that T.G. complied with the requirement of signing an affirmation attesting to his/her entitlement to such a ballot when the signature is completely absent. Where the application for an absentee ballot is a nullity, so too is a ballot cast that follows it. Smith’s application to exclude the ballot is granted. This ballot shall not be counted.
As to the absentee ballots of S.H., F.H. and WZ., because the law requires it, the court also grants Smith’s application to exclude these ballots from consideration. Each of these applications was incomplete because, although each voter indicated the time period that he/she would be absent from the district, and signed the application, the voter did not mark the box indicating the reason for his/her request for an absentee ballot. As a result, none of these voters stated, as required, that “I am requesting, in good faith, an absentee ballot due to [check one reason].” The absence of a statement that the voter is requesting the absentee ballot “in good faith” and the reason therefor, unfortunately, cannot be overlooked. Indeed, acceptance of an incomplete application is tantamount to acceptance of no application, a practice which the Court rejected in Matter of Gross (3 NY3d at 254).
As a result, I disqualify and declare null and void the four absentee ballots. These are not to be counted.
b. The Special Ballots of Election Workers
Two election workers, E.L. and T.L., received special ballots to vote as allowed under Election Law § 11-302 because they were scheduled to work as poll workers on election day. There is no dispute that these workers were qualified for their ballots. Ironically, the Board of Elections managed to accept applications that failed to include the reason the ballot was required. 0See answering aff of Susan A. Bahren If 5.) This constitutes a fatal defect for the reasons set forth above.
3. The Group Three Challenge
Smith’s next challenge initially involved the signatures of six voters. Prior to the hearing, Smith withdrew his challenge to *740 two of these, leaving four ballots for determination. The two ballots which Smith consented to being counted have now been counted.
In support of his order to show cause, Smith submitted an affidavit of a handwriting expert, Robert Baier, dated November 18, 2012. In his affidavit, Mr. Baier attested that he had reviewed various documents and determined: (1) with respect to voter R.J-C. (also known as R.M.C.),[14] “within a reasonable degree of certainty the signatory on the Statement of Absentee Voter of R.J. (above ‘Signature or mark of voter’) was not written by the same person who signed the Absentee Ballot Application with the signature of R.M.C.”; (2) with respect to voter J.C.,[15] “it is my opinion that the signature contained in the Statement of Absentee Voter purporting to be signed by J.C. was not written by J.C.” above either the “Signature or mark of voter” or above the “Signature of witness to mark”; (3) with respect to voter R.L.,[16] “it is highly probable that the signature on the Statement of Absentee Voter purporting to be the signature of R.L. was not written by R.L.”; and (4) with respect to voter S.O.,[17]
“within a reasonable degree of certainty, the signature contained in the Statement of Absentee *741 Voter (above ‘Signature or mark of voter’), purporting to be signed by S.O. was not written by S.O. The signature purporting to be S.O’s was not written by the same person who signed the Absentee Ballot of S.O.”
Mr. Baier also testified to his opinions at the hearing.
While on the witness stand, Mr. Baier was presented with a “buff card” of R.L. which contained an additional 20 or so signatures of the voter. The court notes that in his affidavit, Mr. Baier attested that it was “highly probable that the signature on the Statement of Absentee Voter purporting to be the signature of R.L. was not written by R.L.” Upon viewing the buff card, Mr. Baier downgraded his own opinion and declared that it was no longer an opinion of “highly probable” but, rather, was now only “with a reasonable degree of certainty.” This degradation of his opinion is consistent with his testimony that expert handwriting analysts prefer to have 25 known signature exemplars with which to compare the selected signature to reach an opinion. Here he did not have the preferred number.
Indeed, for two of the voters he had fewer than five exemplars with which to compare. Mr. Baier testified, on the court’s question, that the certitude of his opinion reduces with a reduced number of samples. His near immediate reduction in his degree of certainty, even though it went from a standard not required (“highly probable”) to one which is acceptable (“with a reasonable degree of certainty”) leaves this court with little confidence in the reliability of any of the opinions expressed by him. One must wonder, as does this court, whether, if presented with additional samples of signatures for the other voters, Mr. Baier’s opinions would similarly degrade.
Further, I note that Mr. Baier testified that the sine qua non of identifying signatures is to look for similarities and differences. Where there are too many similarities, the signatures are deemed to be not genuine. Similarly, where there are too many differences, the signatures are deemed to be not genuine. Here, where by his own admission, he had fewer than the recommended number of exemplar signatures to evaluate and he admits that the fewer the number of signatures he has to evaluate, the less certain he is of his opinion, the court cannot discern how he can reach any opinion with any degree of certitude.
*742 In addition, it was established at the hearing that Mr. Baier was unaware of the age of the voters and/or the status of their health. Hence, although Mr. Baier based his opinion that R.L. did not sign her ballot, at least in part, on the fact that her signature was further away from the signature line than on other known signatures, Mr. Baier was unaware that voter R.L. is now 92 years of age. His sole response to having been informed of that fact was to state that, generally, older people write their names smaller, not larger as is the case for this voter. This gross generalization is simply indefensible in this court’s opinion. There are many reasons why a person’s signature might be closer to or further from a signature line and an equal number of reasons why a person’s signature might be smaller or larger than other times it is signed, not just forgery. In short, the failure to consider the possibility that changes in a person’s signature might occur as one ages or for other non-nefarious reasons is indefensible.
Finally, I note that with respect to voter J.C., Mr. Baier’s opinion in his affidavit lacked any degree of certainty whatsoever. He simply states, “it is my opinion that the signature contained” (Baier aff at 3, K 6). Such an opinion would be inadmissible as a matter of law. To the extent that Mr. Baier may have testified that he held this opinion “with a reasonable degree of handwriting certainty” at the hearing,[18] such an opinion would constitute a variance from his affidavit and report; a tick up in certainty, if you will, without reference to or reliance upon any additional information. The fact that Mr. Baier is able to shift the certitude of his opinions so easily allows me to conclude, as the trier of fact, that I do not wish to, and concomitantly do not, accept his testimony. Simply put, I find, as the finder of fact, that there has been inadequate proof that the signatures were not made by the same person such that I should reject all of the challenged ballots.
There was no other testimony offered at the hearing on this issue.[19]
*743 The court holds that the ballots at issue should not be invalidated based upon the signatures of these voters. As such, the ballots cast by them are to be counted.
4. The Group Four Challenge
Smith initially objected to the counting of 27 votes which were cast by affidavit ballot by voters who had earlier in the day been given a ballot that did not include the county legislator contest in the 18th District although it should have. Smith subsequently withdrew that challenge and these votes have now been counted.
B. Smith’s Request for the Court to Order the Casting of Ballots in the Subject Race Due to Irregularities at the Polling Place on Election Day
The facts surrounding the errors at the Bullville firehouse polling location are, essentially, undisputed and were, for the most part, stipulated to by the parties at the hearing.
1. Facts Surrounding the Bullville Polling Place Error
The parties stipulated to the following facts at the hearing:
At the election on November 6, 2012, the Bullville firehouse was the polling site for Districts 4, 5 and 7 in the Town of Crawford. Only District 4 lies within the 18th Legislative District and therefore only those voters residing in District 4 were eligible to vote for the office of legislator for the 18th Legislative District, which includes the candidate petitioners and respondents in this matter. There were 15 polling inspectors at the Bullville firehouse on election day, all of whom were scheduled to arrive at approximately 5:15 a.m. and work until at least 9:00 p.m. Ballots for District 4 were supposed to be placed on the table for District 4; ballots for District 5 on the District 5 table and ballots for District 7 on the District 7 table. Shortly after the polls opened (at approximately 6:15 to 6:30 a.m.), Inspector Marilyn Hoffman placed a call to the Board of Elections, which was received by or transferred to Commissioner Susan Bahren. Inspector Hoffman advised Commissioner Bahren that some voters complained that the office of legislator was not on the ballot. At that time, Commissioner Bahren was unaware of the placement error and did not further investigate. Commissioner Bahren did not go to the Bullville firehouse at that time or call Commissioner David Green.
At approximately 7:45-8:00 a.m. a call from Inspector Hoffman was transferred to Deputy Commissioner Courtney Can- *744 field Greene, advising that all the ballots for all three districts in the Bullville firehouse had inadvertently been placed on the wrong tables. By approximately 7:30 a.m., Inspector Hoffman corrected the error by placing the correct ballots on the correct tables before calling the Board of Elections and speaking to Deputy Commissioner Canfield Greene.
Deputy Commissioner Canfield Greene called Commissioner Bahren after speaking with Inspector Hoffman at approximately 8:00 a.m. to advise that the ballots had been placed on the wrong tables at the polling site. Following the conversation with the Deputy Commissioner, a few minutes later, Commissioner Bahren called Commissioner Green and advised of the errors that occurred at the polling site. Commissioner Bahren went to the Bullville firehouse. Deputy Commissioner Canfield Greene also called Commissioner David Green at approximately 8:30 a.m. to advise of the errors that occurred at the polling site. As a result of the misplacement of the ballots on the incorrect tables, 53 District 4 voters voted on District 7 ballots, 28 District 5 voters voted on District 4 ballots, and 50 District 7 voters voted on District 5 ballots. (Initially the parties believed that 55 District 4 voters voted on the wrong ballots but have since determined that 53 voters voted on the wrong ballots.)
Twenty-seven voters from District 4 who had previously voted by machine on the wrong ballots returned to the Bullville firehouse and voted by affidavit ballot. Those 27 voters have been identified by all parties and their affidavit ballots were set aside and unopened. The parties have now stipulated that these 27 shall be counted. (As noted above, pursuant to the stipulation of the parties, these have been counted.) Twenty-six voters from District 4 who had previously voted by machine on the wrong ballots did not return to the polling site to vote by affidavit ballot.
In addition to these stipulated facts, at the hearing, the court heard testimony from a voter (Carl Root) who recognized that the Smith/Sullivan race was absent from his ballot when he voted at the Bullville firehouse at approximately 6:15 a.m. and reported this error to the poll workers. Before leaving the polling place, he gave his phone number to Inspector Hoffman so that he could be advised by phone of whatever remedy could be fashioned to rectify the error. The voter later received a phone call and was advised that he could return and complete an affidavit ballot for the subject office and he did so.
*745 At the hearing, Smith’s counsel advised the court that he intended to call 20 people from whom affidavits[20] had been obtained, each of whom would testify that he/she received an incorrect ballot and wanted to vote by affidavit at this time. Rather than hear the testimony from all of the witnesses, and because the relevance of such testimony was in dispute, the court invited a stipulation as to what the testimony would be if received. Ultimately, the parties stipulated that if called to testify each of the 20 people from whom affidavits had been obtained by Smith’s supporters would testify that “had they been given the opportunity, they would have liked to have voted in this race.”
Finally, the parties stipulated that if the poll worker who was advised of the error by Mr. Root were called to testify, she would testify that after being informed by Mr. Root of the error, he left a phone number so that she could call him and advise him as to what could be done to correct the error, and that Subsequently, she called him to advise him that he could complete an affidavit ballot. It was further stipulated that Mr. Root was the only voter who left his phone number.
2. Smith’s Request for Correction of the Bullville Error
In what appears to be a case of first impression, Smith asks this court to order that the 26 potential voters who appeared at the polling station, voted on the incorrect ballot, and did not return to vote on the absent race should be granted the opportunity to now vote on an affidavit ballot for the county legislator race. Smith contends that the court has authority to do so under Election Law § 16-106 (4) which permits the court to “direct a recanvass or the correction of an error, or the performance of any duty imposed by law on such a state, county, city, town or village board of inspectors, or canvassers.” Contrary to the 20 voter affidavits he submitted in support of his order to show cause, Smith now asserts that he does not seek a *746 new election, but rather seeks to have the court remedy an error by the Board of Elections by having the court order that the election “be completed.”
Smith contends that article 16 of the Election Law permits this court to rectify the errors at Bullville where the mistake of the poll workers resulted in 26 voters not being able to vote for their county legislator. In this regard, Smith urges this court to find that I have the authority to order the affected voters to cast votes in order to “complete the election.” (Smith mem of law, Dec. 3, 2012 at 20.)
I reject the suggestion that I have the authority to order that which Smith seeks, whatever it is called, and, therefore, dismiss his petition insofar as it seeks any redress as to the 26 voters. Whether I direct that 26 more people be allowed to vote via affidavit to “complete the election” or whether I direct that these same 26 people be allowed to vote in a “new election,” the net effect is the same; I would be impermissibly extending the casting and counting of ballots in the subject race.
Election Law § 16-106 (4), upon which Smith relies, provides: “4. The court may direct a recanvass or the correction of an error, or the performance of any duty imposed by law on such a state, county, city, town or village board of inspectors, or canvassers.”
Almost universally, the cases that interpret and apply this section deal with mathematical errors in tallying or counting of votes or the unexplained interruption of counting of votes actually cast. None go so far as to hold that a court has the authority to extend voting, even in the face of egregious error. And none hold that a court can order a vote not cast to be counted.
In fact, the law is clear that
“[a]ny action Supreme Court takes with respect to a general election challenge must find authorization and support in the express provisions of the [Election Law] statute. In a summary proceeding under Election Law article 16 respecting the conduct and results of a general election, [Supreme Court’s] only powers are (1) to determine the validity of protested, blank or void paper ballots and protested or rejected absentee ballots and to direct a recanvass or correction of any error in the canvass of such ballots . . . and (2) to review the canvass and direct a recanvass or correction of an error or performance of any required duty by the board of canvassers.” (Matter *747 of Delgado v Sunderland, 97 NY2d 420, 423 [2002] [internal quotation marks and citations omitted].)
Contrary to Smith’s assertions, Matter of Panio v Sunderland (4 NY3d 123 [2005]) does not provide this court with authority to usurp power which it does not have. Panio involved votes which had actually been cast, albeit at an incorrect voting district.[21] Under those circumstances, the Court ordered that the votes be counted. As said previously, no law permits this court to order votes which have not been cast to be canvassed.
I believe that this case is akin to those cases which involve malfunctioning voting machines. In one of the leading cases arising from a voting machine malfunction, the Court of Appeals held that “[w]ithin the limited authority afforded under article 16, Supreme Court has jurisdiction over allegations of certain serious irregularities.” (Matter of Delgado, 97 NY2d at 423 n.) I agree that the instant case involves serious allegations of irregularities, but the highest court in our state has declared that my authority is limited. Indeed, in Delgado, the Court deferred judicial intervention into a malfunctioning voting machine case, even where “the effect of that malfunction . . . remains a disputed issue of fact which cannot be resolved merely by recanvassing. Under these circumstances, the proper vehicle for challenging the results and contesting title to the public office of the purported winner is a quo warranto action” (Id. at 423-424.) “Challenges to the outcome of a general election based upon alleged voting machine malfunctions necessarily fall within the purview of quo warranto.” (Id. at 424.)
A quo warranto action, simply put, is one brought to remove a person from office where it is alleged that the person who occupies it is not the one who has been duly elected to it. The power to commence a quo warranto action is, under Executive Law § 63-b, vested solely in the Attorney General. {Id.) Thus, this court lacks authority to provide any remedy to Smith (or the affected voters). In mentioning this procedure, the court does not mean to imply that a quo warranto proceeding, if brought, would have merit, only that, procedurally, it exists.
While it is indeed unfortunate that 26 citizens who made the effort to go to the polls on election day were unable to vote in a race that determined who their county legislator will be, I conclude that this court does not have the authority to issue an order remedying the errors at Bullville.
*748 In so concluding, I note that upon being notified of the error at the polling station, both campaigns had the opportunity to have voters who they felt were supportive of their candidate return and execute an affidavit ballot. Indeed, 27 of the 53 affected voters took advantage of that opportunity and their votes have now been counted. Either the other 26 were not so motivated to participate in that race to return to cast affidavit ballots or, as was the case of one voter Smith’s counsel referenced,[22] they were prevented from doing so because of the need to be elsewhere, such as at work. That anyone should be prevented from voting because he/she must be at work speaks eloquently, in this court’s opinion, for the fact that it is high time for this country to recognize that election day should be a national holiday. Unfortunately, I lack authority to order that as well. While such a declaration would not prevent errors like the one that occurred at Bullville, most[23] of those affected by the error could, likely, have found time to return to cast an affidavit ballot and be counted.
The evidence shows that at least some of Smith’s supporters returned and executed affidavit ballots. Indeed, of the 32 ballots counted after the morning session, 19 were for Sullivan and 11 were for Smith. That demonstrates to this court, beyond cavil, that Smith’s supporters had equal opportunity to return to vote. That they did not do so because of their own commitments does not mandate that this court assert authority that it does not have. This also demonstrates that Smith’s claims of denial of equal protection to his supporters rings hollow. Each had the opportunity to appear on election day and cast his/her vote.
Finally, with respect to Smith’s contention that there was an “agreement” between the election commissioners not to count any affidavit ballot of a voter who had previously voted on an incorrect ballot, such an agreement, if made, would be null and void as against public policy. It is for courts, like this one, to determine whether contested affidavit ballots should be counted. Neither commissioner, independently, or in conjunction with the other, can negate either a voter’s right to cast an affidavit ballot *749 or this court’s right and obligation to determine if such a ballot should be counted.
In sum, Smith’s application for the court to allow voting by those 26 voters who remain affected by the Bullville error because they did not return to cast affidavit ballots is denied in all respects.
All other arguments made have been considered and found to be without merit.

. Mr. Smith is the candidate of the Republican, Conservative and Independence Parties.

. Ms. Sullivan is the candidate of the Democratic and Working Families Parties.

. A special election was necessitated when Dan Depew was elected to the position of supervisor of the Town of Walkill and vacated his county legislator seat. Smith was appointed in February to fill the seat pending the election on November 6, 2012 for the remainder of Mr. Depew’s term. An election for the full term will be held in November 2013.

. During the lunch break on the day of the hearing, the parties went to the Board of Elections’ offices and counted 32 ballots which were initially challenged but were no longer being contested. It was reported to the court after the lunch break that of the 32 counted ballots, 19 were cast for Sullivan, 11 were cast for Smith and three were blank. As a result, Sullivan’s lead increased from four to 12, the exact number of ballots which remain challenged by both parties.

. There was some discussion at the hearing that Mr. Jacobson in fact objected to two ballots, but not the two which are before me for determina *731 tion. In light of my decision on the merit of these challenges, the procedural objection is of no moment.

. This would seem an odd occurrence since election workers are obliged to stand ready by the voting machines to insert, or assist in inserting, ballots. One must wonder where the poll workers were.

. I note that Smith’s counsel also asserts at page 8 of his December 3, 2012 memorandum of law that the word “Abandon” was written on the front and rear of the ballot. I reject that assertion. There is simply no evidence that the word was written on both front and rear of the ballot.

. A system as simple as having a stamp pad or labels at each voting location with a preprinted statement “Found and marked Abandoned at [election district number] by poll worker [insert name] at [time] signed [poll worker]” would provide more certainty than the apparent ad hoc system in place. Indeed, the current system is anything but a system and invites contest and controversy.

. The supreme court race is not the subject of this application and nullification of this ballot for that office will have no effect on that race.

. This finding negates Smith’s procedural argument that Sullivan did not object to this ballot.

. This number is now 26 based on the parties’ stipulation to allow the votes cast by those voters who returned to the polling place and voted by affidavit ballot to be counted.

. At page 8 of his December 3, 2012 memorandum of law, Smith’s counsel raises, for the first time, an issue with respect to a ballot cast by a voter with initials L.N-S. He contends that this court should enjoin the counting of that ballot even though it was not addressed in either party’s papers or at the hearing since it was “ technically ‘in’ this litigation” by virtue of this court having enjoined the counting of all ballots objected to by Sullivan’s counsel during the November 15 and 16 canvass of the vote. The court declines to take any action with respect to this vote based on the failure of either party to address it at the hearing and, moreover, the lack of opportunity that Sulli *735 van’s counsel had to respond to this post hearing request. If that vote remains “permanently” temporarily enjoined, then so be it.

. For those ballots which have been challenged the court will refer to the voter by his/her initials only.

. For voter R.J-C., he reviewed a voter registration card dated January 21, 2005; an absentee ballot application dated September 16, 2001; an address correction postcard (undated); and a statement of absentee voter. The documents introduced into evidence at the hearing with respect to this voter were: the front of absentee ballot envelope (exhibit A-l); rear of absentee ballot envelope (A-2); absentee ballot application (A-3); registration form dated September 19, 2001 (A-4); registration form dated January 21, 2005 (A-5); registration form dated April 23, 2010 (A-6) and address correction postcard (A-7).

. For voter J.C., he reviewed an absentee ballot application dated October 16, 2012; an affidavit ballot envelope dated November 4, 2008; and a statement of absentee voter dated October 24, 2012. The documents introduced into evidence at the hearing with respect to this voter were: the front of absentee ballot envelope (exhibit B-l); rear of absentee ballot envelope (B-2); affidavit oath (envelope) (B-3); rear of affidavit envelope (B-4); and absentee ballot application (B-5).

. For voter R.L., he reviewed an absentee ballot application dated October 20, 2004; voter registration card dated November 10, 1973; and a statement of absentee voter dated October 12, 2012. The documents introduced into evidence at the hearing with respect to this voter were: front of absentee ballot envelope (exhibit C-l); rear of absentee ballot envelope (C-2); voter registration (C-3); voter registration signature on back of voter registration card (C-4); and absentee ballot application (C-5).

. For voter S.O., he reviewed an absentee ballot application dated August 10, 2012; voter registration form dated July 13, 2012; and a statement of absentee voter dated October 14, 2012. The documents introduced into evidence at the hearing with respect to this voter were: front of absentee ballot *741 envelope (exhibit D-l); rear of absentee ballot envelope (D-2); absentee ballot application (D-3); and voter registration card (D-4).

. Neither party ordered the minutes of the proceeding and the court’s notes, though copious, do not reveal what degree of certainty Mr. Baier used with respect to his opinion as to J.C.’s signatures.

. I note for the record, in the event that this decision and order is appealed, that Sullivan’s attorney requested that two voters whose signatures were questioned — J.C. and S.O. — be permitted to testify by telephone. That request was denied by me given the lack of opportunity for me to evaluate the credibility of the witnesses or even to be certain that the person who I *743 administered the oath to by telephone was, in fact, the person who he/she stated he/she was.

. The affidavits are attached to Smith’s order to show cause as exhibit C. Each reads substantially the same, save for the name and address of the voter and the time at which each voted. Though Smith contends that he does not seek a new election, each affidavit concludes, identically, with the following:
“I want to vote in the election for County Legislator and request that I be permitted to do so via a new election or a second day of voting for myself and others similarly situated, so that each of us who appeared at the polls properly to vote, can actually vote in the election for County Legislator, as we were entitled to.” (Emphasis added.)

. Panio does provide support for counting the 27 affidavit ballots that were opened and counted during the lunch break.

. Smith’s counsel advised that voter “Allen,” who was one of the 20 who provided an affidavit, is a New York City firefighter who, after voting, was required to be on duty in New York City and could not return before polls closed.

. There will always be a class of people engaged in certain professions such as police, firefighters, medical or other necessary services who would still have to work, but the percentages of those who would vote if they did not have to get to work would, in my opinion, decidedly increase.